[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff bank has brought this action on a note that it holds in the original amount of $155,000 signed by four individuals, including the defendant, Salvatore Garofalo, who is the only one of the makers of the note who remains financially responsible because the others have filed bankruptcy or are insolvent. The dispositive issue in this case is whether or not there was an accord and satisfaction between the plaintiff, The Savings Bank of Rockville (the bank) and the named defendant, Salvatore Garofalo, and because many of the underlying facts bearing on that defense were submitted to the court at the time of the trial in the form of a written stipulation that incorporated by reference all of the correspondence between the attorneys for the parties (Joint Exhibits numbered 1 though 14) the facts stated therein and the substance of the documents referred to in the stipulation may be summarized as follows.
On September 14, 1995, Attorney James Throwe, on behalf of the defendant (Garofalo), and Attorney Steven Basche, on behalf of the bank, attended a settlement conference conducted by Judge Bishop. In the course of that conference it was proposed that Garofalo pay $125,000, and that any additional amount due, including interest, costs and attorney's fees, would be paid out of the proceeds of a malpractice action that Garofalo had filed against Attorney Michael Bars.
After they had consulted with their clients about the proposed settlement, Basche indicated to Throwe that the proposal might be acceptable to his client, but that he needed more facts about the malpractice action and wanted to discuss it with Attorney Susan Wise, Garofalo's attorney in that case. After contacting Wise on October 31, 1995, Basche told Throwe that he was prepared to proceed, and Throwe said that he would draft an agreement reflecting the proposed settlement.
Throwe indicated that Garofalo would pay $125,000 as the cash portion of the proposed settlement, but that his client had to sell some stock, or cash in a CD, in order to raise the necessary funds, and in November 1995, Throwe indicated that he expected that Garofalo could pay the cash amount of the settlement in early December. However, Wise died suddenly of a stroke on December 6, 1995, and after Basche had been advised of her death CT Page 1556 and the consequent delay until substitute counsel could be obtained, he sent a letter to Throwe dated January 11, 1996, in which he reminded him about the draft of the settlement agreement which Throwe was to prepare, as well as of the fact that Throwe had indicated that Garofalo would be in a position to pay the cash amount by the end of January.
Basche also stated in the letter of January 11, 1996, that "[w]hile I understand that Attorney Wise's death presents a problem in terms of the timing of the malpractice action, you and I should be able to agree on terms which are independent of who is prosecuting the case. He also offered to draft the settlement agreement if Throwe preferred that he do so.
On January 19, Basche faxed a reminder to Throwe that he was "getting some heat from his client to put this matter to rest" and again offered to draft the agreement. After a telephone conversation between them on January 26, Basche renewed his offer and faxed a draft of the proposed settlement agreement to Throwe.
On January 31, when Basche contacted Throwe regarding comments on the agreement, Throwe indicated that he had not received it, and at about 2:30 p. m. that afternoon (Joint Exhibit 14) Basche again faxed the settlement agreement to Throwe with the notation that he review it as soon as possible. Later that afternoon, by fax transmission time-stamped 5:10 p. m. (Joint Exhibit 3), Basche referred to Throwe's prior statement that Garofalo could make the cash payment by the end of January, and that he had "related that to [his] client [and that if you prefer to pay the money to me in escrow, pending execution of the documents, my client would allow that [but] if I don't have a check today, I have been instructed to continue the litigation vigorously."
In response to the 5:10 p. m. fax, Throwe called Basche concerning getting the agreement signed and the documents that would be needed for the malpractice case and the immediate transfer of monies from Florida by Garofalo. Thereafter, Basche faxed a second letter (Joint Exhibit 4) at 5:20 p. m. acknowledging the telephone conversation in which he asked for Throwe's comments on the documents, and also stated that "we need a UCC-1 on the assignment and some confirmation from the new attorney handling the case that they are aware of the assignment", and asked Throwe to keep in touch with him. CT Page 1557
On February 1, 1996, Throwe faxed a letter to Garofalo which was also faxed to Basche (Joint Exhibit 5), which stated that the two attorneys "had worked out a settlement stipulation" and that he was enclosing a copy of the stipulation and assignment "which we are working on." Throwe also stated in the letter to his client that an additional $60,000 would have to be raised to make up he difference between the CD and the $125,000 cash portion of the settlement.
On February 2, Throwe faxed a letter to Basche in which he stated that Mrs. Garofalo could have the total cash in any event "with or without the CD's by February 15, 1996". He also stated that he thought that it would be best if the new attorney who was handling the malpractice action reviewed the stipulation to make sure that it would be collectible against the defendant attorney in that case, and he enclosed an unsigned revised stipulation which gave the date that payment would be made as "on or before February 1, 1996."
On February 7, there was a conversation between the attorneys in which Basche stated that the bank did not want to take a chance on the malpractice case, and that questions were raised by his client about the case and the nature of the expert testimony that would be offered at the trial. Throwe responded in a letter dated the same day (Joint Exhibit 7) that there was no question in his mind that the stipulation that had been drafted was based on the settlement discussion with Judge Bishop and that he expected the bank to abide by it since Throwe acted in reliance on it in not moving to transfer the case from the state court to the federal court, and in selling securities to raise the cash portion required under the stipulation.
On February 9, Basche advised Throwe by letter that because of Garofalo's failure to make the payment by January 31, 1996, and based on the fact that the bank did not agree to seek recovery only out of the proceeds of the malpractice action, "any settlement along the lines previously discussed is no longer possible." On February 15, Throwe delivered a check for $125,000 marked "payment in full for stipulated judgment", and a letter, along with a stipulation for judgment that he had signed, stating that he intended to "press this stipulation as [an] accord and full satisfaction."
On February 20, Throwe sent Basche an assignment of the proceeds of any recovery in the malpractice action by way of a CT Page 1558 settlement or by judgment. On February 27, the check was returned by Basche, and in the accompanying letter (Joint Exhibit 13), he stated that his reasons for doing so were, first, that "there was no meeting of the minds [because the bank] had not agreed to limit its source of recovery on the balance of the amount owed to the proceeds of any malpractice action [and second], even if there had been an agreement, the check was not tendered by January 31, which was the deadline we had discussed."
The only witness called by the plaintiff was Betty Sullivan, vice president and senior loan officer of the bank, who identified the original note as being in default and also testified that the outstanding principal balance due on the loan was $133,947.08, that the total amount of interest due as of July 23, 1996 at 9 percent, was $40,887.26, and that late charges up to that date were $3,890.25. Basche also submitted an affidavit and an itemized statement of services rendered by his law firm in the amount of $8,108.35, as well as a bill for services by prior counsel for the plaintiff of $2,360.35, for a total of $10,468.70 claimed for attorney's fees as of the date of the trial:
After the plaintiff had rested, the defendant called Sullivan as his first witness and questioned her about various documents in the bank's file concerning the attempts by counsel for the parties to arrive at a settlement agreement following the settlement conference held on September 14, 1996. In a memo to the file that Sullivan made on that date she described the judge's proposal as explained to her by Basche, and stated that "[t]he only hitch is that if [Garofalo] is not successful in his suit, we would not get this money."
Her understanding of the proposal for settlement suggested by the judge was that the bank would get $125,000 and that thereafter it would receive all monies due from the proceeds of the malpractice suit, if any, but that Garofalo would continue to remain liable to the bank for the full amount due regardless of the outcome of the lawsuit. She testified that when she said the only hitch was that "the bank would not get this money", she meant that if the suit was unsuccessful the bank would have to get its money directly from him rather than from the proceeds of the malpractice action.
She also testified that her understanding was shared by William J. McGurk, president of the bank, during the entire time that the attorneys were negotiating. She stated that he had sent CT Page 1559 her a note on the back of his copy of Throwe's letter of February 2, 1996 (Defendant's Exhibit 7), stating that he had phoned Basche to tell him that he expected to collect the full balance with interest, late charges and attorney's fees, and noted that he had offered concessions to Garofalo in December, 1993, but added "that is long past — I want 100% now." (Emphasis in original).
She also said that she met frequently with McGurk during that period and that he had always told her that he expected full payment of the account. She testified that from the time of the conference in the judge's chambers when she wrote the memo to her file, they were waiting for a proposal from Garofalo's attorney but that they never received one.
An accord is a contract under which a creditor promises to accept a stated performance in place of the debtor's existing duty, and performance of the accord discharges the original duty.Tolland Enterprises v. Scan-Code, Inc., 239 Conn. 326, 333
(1996). Under Connecticut law, in order to establish an accord and satisfaction, the defendant "must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly tendered as full satisfaction for the debt, and the payment was knowingly accepted." Lamb v. Emhart Corp., 47 F.3d 551,561-62 (2nd Cir. 1995)
When the amount of the debt is undisputed, the payment of a part of the debt is not in itself the payment of the full amount, nor is it an accord and satisfaction, because an accord is an agreement, and the receipt of only a portion of a debt liquidated in amount is not consideration for an agreement not to collect the balance of the debt. Warren v. Skinner, 20 Conn. 559, 561
(1850). Although the court finds from its review of the evidence, that certainly at least from the bank's perspective, based on Sullivan's testimony and the unequivocal position taken by McGurk with respect to the defendant' s account (Defendant' s Exhibit 7), the amount of his obligation to the bank was not only liquidated in amount, but there were no viable legal defenses to its claim pursued at the time of the trial other than accord and satisfaction, the court will nevertheless proceed to consider whether there was a "meeting of the minds" in the contractual sense sufficient to support the existence of an agreement between the parties as the first essential element of the defense asserted by Garofalo. CT Page 1560
Where there is a good faith dispute about the existence of a debt or about the amount that is owed, the law authorizes the debtor and the creditor to negotiate a contract of accord to settle the outstanding claim. Herbert S. Newman Partners v. CFCConstruction Ltd. Partnership, 236 Conn. 1750, 764 (1996). "Such a contract is often initiated by the debtor, who offers an accord by tendering [payment, and upon] acceptance of the offer of accord, the creditor's receipt of the promised payment discharges the underlying debt . . . ", if the contract is supported by consideration; County Fire Door Corp. v. C.F. Wooding Co.,202 Conn. 277, 281 (1987); or "by a debtor's reasonable and foreseeable reliance on a promise by a creditor to forgive the remainder of an outstanding debt." Id. n. 2.
Suggestions made in the course of negotiations by attorneys between themselves do not constitute definite offers where the minds of the parties themselves have not met in any definite agreement. Peerless Soda Fountain Service Co. v. Savin,117 Conn. 1, 4-5 (1933). Moreover, an attorney "has no implied powers by virtue of his general retainer to compromise and settle his client's claim or cause of action [and either] precedent special authority from the client or subsequent ratification by him is essential in order that a compromise or settlement by an attorney shall be binding on his client." Cole v. Myers, 128 Conn. 223
at 227 (1941).
Under a factual scenario strikingly similar to the one in this case, except for the fact that the creditor's attorney was dealing directly with the debtor who was not represented by counsel, it was held that there was no meeting of the minds where the attorney had no authority to enter into an agreement for compromise that was never authorized by his client. Loraas v.Connolly, 131 N.W.2d 581 (N.D. 1964). A common intention or meeting of the minds of the negotiating parties themselves is essential to the making of an accord, and where one party understands an agreement of settlement to be one thing, and the other party understands it to be another, there is no meeting of the minds of the parties, regardless of what the attorney conducting the negotiations believes to be his client's understanding. Id.
The court finds the testimony relating to the bank's understanding of the proposal which was the subject of the negotiations to be entirely credible and concludes that the plaintiff's attorney was without authority to enter into the CT Page 1561 "agreement" which is the basis for the defendant' s special defense. Accordingly, there was no meeting of the minds and no agreement between the parties.
It should also be noted that even if there were such an agreement, the performance of the condition that payment be made on or before January 31, 1996 was the consideration for the plaintiff's promise and the bank was relieved from any further obligation because of the defendant's failure to do so. Francis
v. Deming, 59 Conn. 108 (1890).
For the foregoing reasons, the court finds the issues for the plaintiff on the defendant's special defense.
Judgment will enter upon the filing with the court of an updated affidavit of debt and statement of attorney's fees, if no request for a hearing thereon is filed by the defendant within one week of the date of the filing of this decision.
Harry Hammer Judge Trial Referee